# In the United States Court of Federal Claims

No. 12-375C
(Filed November 1, 2012)

```
* * * * * * * * * * * * * * * * * * * * * *    *
                                             *
SIERRA NEVADA CORPORATION,                   *    Post-award bid protest; 28
                                             *    U.S.C. § 1491(b)(1) (2006);
            Plaintiff,                       *    permanent injunctive relief;
                                             *    corrective action; negotiated
        v.                                   *    procurement; basis for corrective
                                             *    action; reasonableness of
THE UNITED STATES,                           *    decision to take corrective action
                                             *    canceling award to protestor in
            Defendant,                       *    case at bar; reasonableness of
                                             *    corrective action implemented to
        and                                  *    call for new proposals based on
                                             *    amended solicitation.
HAWKER BEECHCRAFT DEFENSE                     *
COMPANY, LLC,                                *
                                             *
            Defendant-Intervenor.            *
                                             *
* * * * * * * * * * * * * * * * * * * * * *    *
```

Todd W. Miller, Colorado Springs, CO, for plaintiff.

John H. Bennett, Washington, DC, with whom was Acting Assistant Attorney General Stuart F. Delery, for defendant.

James J. McCullough, Washington, DC, for defendant-intervenor. Michael J. Anstett, Aaron T. Tucker, and Brian M. Stanford, Fried, Frank, Harris, Shriver & Jacobson LLP, of counsel.

## MEMORANDUM OPINION AND ORDER 1/

_____

1/ This opinion was originally filed under seal on October 15, 2012. The parties were requested to notify the court of any redactions. Defendant did not request any redactions. Plaintiff's and Intervenor's redactions of protected material have been adopted.

**MILLER**, Judge.

This post-award bid protest, involving corrective action that is being implemented during these proceedings, is before the court after argument on cross-motions for judgment on the administrative record. The case is peculiarly positioned. In late 2011 the United States Air Force (the "Air Force") awarded a contract for non-developmental aircraft to the protestor in this case. An earlier protest before another judge was dismissed in spring 2012, upon defendant's filing a notice that the Air Force would take corrective action canceling the award to the protestor in this case; restoring the disqualified offeror to the competitive range; and accepting new proposals from the offerors, possibly based on an amended solicitation. The Air Force ultimately implemented corrective action by deeming both offerors qualified to propose and calling for new proposals to be evaluated against the amended solicitation. However, from this protestor's viewpoint, the specific changes removed impediments to an eventual award to defendant-intervenor in this protest, the protestor in the 2011 action. Especially disconcerting to this protestor are the feature of the corrective action that appears to bypass a Competitive Range Determination that failed defendant-intervenor on the first evaluation and those features of the amended solicitation that eliminate the flight test from the risk assessment and modify a prohibition on government funding for development of the aircraft that is being proposed. Moreover, congressional set-asides for testing of avionics equipment by defendant-intervenor—not requested by the Air Force—had defendant-intervenor using its aircraft to test other systems during issuance of the original Solicitation. The Air Force has acknowledged that the award process from the outset would be contentious due to the zeal of the two competitors and congressional stagecraft. The stakes are also significant—now a $350-million contract for twenty fixed-wing aircraft to be ordered over five years and delivered to the Afghanistan National Army Air Corps.

## BACKGROUND

### I. Solicitation and award of contract

The Air Force on April 16, 2010, issued a Pre-Solicitation Notice for the Acquisition of Light Air Support Aircraft ("LAS"). Suppl. AR 210-15. 2/ On October 29, 2010, the Air Force issued Solicitation No. FA8637-10-R-6000 (the "Solicitation") for the acquisition of a non-developmental light attack aircraft, Compl. filed June 12, 2012, ¶¶ 1, 17, for delivery

---

2/ The Administrative Record ("AR") citations refer to the administrative record in this case. The Supplemental Administrative Record ("Suppl. AR") includes relevant documents from the prior protest.

to the Afghanistan National Army Air Corps under a firm fixed-price ("FFP") indefinite delivery/indefinite quantity ("IDIQ") contract, Suppl. AR 211. By December 2010 only Sierra Nevada Corporation ("SNC" or "plaintiff") and Hawker Beechcraft Defense Company, LLC ("HBDC" or "intervenor"), had submitted proposals to the Air Force; no other proposals were submitted. Id. ¶ 18. Both SNC's and HBDC's proposals initially were evaluated and determined to have passed the "Entry Gate Criteria," and the Air Force then began evaluating the proposals for compliance with the other Solicitation requirements. Id. ¶ 20. On November 1, 2011, the Air Force informed HBDC that it had been excluded from the competition because its proposal contained "'multiple deficiencies and significant weaknesses'" that HBDC had not been able to correct. Id. ¶ 21. HBDC filed a protest with the Government Accountability Office (the "GAO") on November 21, 2011. See Hawker Beechcraft Def. Co., LLC, B-406170, 2011 WL 6540509 (Comp. Gen. Dec. 22, 2011). The GAO dismissed HBDC's protest as untimely on December 22, 2011, id. at *4, and on that same day the Air Force awarded SNC the LAS contract, Compl., ¶ 22.

## II. HBDC bid protest and Air Force decision to take corrective action

HBDC filed a complaint in the United States Court of Federal Claims on December 27, 2011, protesting the decision to award the contract to SNC. Complaint, Hawker Beechcraft Def. Co., LLC v. United States, No. 11-897C (Fed. Cl. Dec. 27, 2011) ("No. 11-897C"). HBDC's complaint made three primary allegations: (1) that it had been erroneously excluded from the competitive range; (2) that the Air Force had improperly evaluated SNC's proposal; and (3) that the Air Force had demonstrated disparate treatment favoring SNC. See Def.'s Br. filed Aug. 6, 2012, App. at A4 (Def.'s Mot. to Dismiss in No. 11-897C, filed Mar. 5, 2012). The presiding judge, the Hon. George W. Miller, held a status conference with the parties on December 28, 2011, during which defendant agreed to file the administrative record by January 10, 2012. See id. at A18 (Order in No. 11-897C, entered Dec. 28, 2011). During the week of January 3, 2012, the "LAS PMO" [the LAS Procurement Management Office] sent the Department of Justice ("DOJ") eleven discs of documents, along with a three-page "index" listing the folders on the discs. See AR 700-03 (undated "Bullet Background Paper on Light Air Support (LAS) Personnel Problems" (the "BBP")). The BBP was written by Air Force Program Counsel ("agency counsel"). 3/ The BBP attributes to an unidentified DOJ attorney the statement "it 'appeared someone just threw their hard drive on some discs.'" AR 703. Defendant on January 10, 2012, moved for a one-week extension in

_____

3/ Sandra M. De Balzo is identified at the bottom of the first page of the BBP with a date of "15 Feb 11," AR 700, which appears to be both a typographical error and approximate, as the BBP discussed events that occurred in 2012, including February 16, 2012, AR 700-02. Ms. De Balzo has been identified as Program Counsel. See AR 5015.

which to file the administrative record citing "unforeseen technical difficulties." Def.'s Br. filed Aug. 6, 2012, App. at A27-28 (Def.'s Mot. to Amend Scheduling Order in No. 11-897C, filed Jan. 10, 2012). Defendant's motion also referred to a temporary stop-work order issued by the Air Force on January 4, 2012. Id. at A28.

The record reflects an uphill battle by DOJ and agency counsel in working with Air Force personnel to assemble the administrative record. On January 9, 2012, agency counsel ordered the Program Manager (the "PM") to include in the record an e-mail between high-ranking Air Force personnel. AR 700. After the PM would not "readily" produce the e-mail and when "pressed" by DOJ counsel, the PM asked, according to the BBP, "'What would happen if we didn't put it in?'" Id. Having been advised that he did not have a choice, on January 10, 2012, the BBP records that the PM told agency counsel that he had been "'burned'" by DOJ and that he "'would not have told them about [the e-mail] if he had known they were going to make him put it in the record.'" Id. The PM did produce the e-mail on January 17, according to the BBP, but again asked if the e-mail must be included in the administrative record. Id. Agency counsel again informed him that he could not "'pick and choose'" what information was included in the administrative record. Id.

Defendant filed the administrative record in No. 11-897C on January 17, 2012, but quickly discovered that approximately 1,000 pages, later submitted as a "Proposed Amended Administrative Record," had been omitted from the record on file. See Def.'s Br. filed Aug. 6, 2012, App. at A30-32 (Def.'s Unopp. Mot. Seeking Leave to Amend the Administrative Record in No. 11-897C, filed Feb. 1, 2012). On January 19, 2012, agency counsel reports in the BBP that she instructed the PM and others, as follows:

> *Review each and every Tab to determine if any documents related to the source selection are missing. The determination as to what is "related to" the source selection is a legal one, so, if there is anything you know of that is not in the record, please make us aware of it so we can determine whether it should be included.* ***DO NOT allow anyone on the team to make determinations as to what is appropriate for inclusion. This is not their job and will only lead to trouble later if relevant documents are found to be omitted.*** *Trust me on this.* (Emphasis added.)

AR 701 (italics and boldface in original). Defendant moved to amend the administrative record on February 1, 2012. Def.'s Br. filed Aug. 6, 2012, App. at A30-32.

On February 8, 2012, agency counsel instructed the LAS team to prepare information on the "'potential holes'" in the Government's case so that she could discuss those issues with defense counsel. AR 701. The PM informed her that he did not want such information

to be given to DOJ counsel because he "'did not trust them and it would be released.'" Id. Despite being informed of the privileged relationship, the PM said, in effect, that he "'[did not] want any information about weaknesses in our case going up to DOJ until after HBDC files its motion . . . [and that he did not] want [DOJ] seeing weaknesses that HBDC doesn't end up raising.'" Id. The next day, during a meeting to discuss the weaknesses, the PM instructed the assembled personnel that a paper that was produced by LAS Team Engineers "'does not leave this building.'" Id.

The BBP also noted concerns about potential bias arising from actions by the Program Contracting Officer (the "PCO"). In response to comments from agency counsel that the PCO's proposed Competitive Range Determination (the "CRD"), which eliminated HBDC, was unsatisfactory, the PCO stated that she was not qualified to write it. AR 702. After submission of SNC's Final Proposal Revision ("FPR"), the PCO stated that she needed to reopen discussions with SNC for administrative purposes. Id. Despite being instructed that she must prepare a formal letter to reopen discussions, the PCO did not do so, contributing to an appearance of favoritism toward SNC. Id. The PCO also was instructed to cease discussions with SNC during the pendency of HBDC's bid protest. Id.

HBDC filed its motion for judgment on the administrative record in No. 11-897C on February 14, 2012. See Def.'s Br. filed Aug. 6, 2012, at A33-35. That same day agency counsel learned that some records had been destroyed and took it upon herself to begin examining the relevant archives and shared hard drives for documents, as she reflected in the BBP. AR 701. She discovered roughly 200 GB of data, "some of which was duplicative of the [administrative record], some of which was not." Id. Agency counsel then e-mailed the PM, instructing him to obtain the hard drives for the data so that they could be analyzed to determine whether they should be produced for the administrative record. Id. The next day, February 15, 2012, the PM responded to agency counsel via e-mail, commenting:

> I am concerned if we are providing information that is not relevant to the motion filed last night. Information like the cost workbooks and [cost] analysis that was used by the Government to assure we were paying a fair price but was not otherwise used in the source selection decision or as a basis to eliminate [HBDC] and is not addressed in the motion filed last night—why would we want to now try and add that to the record?

AR 702 (italics and first alteration in original).

Upon this latest discovery, the upper levels of the Air Force began considering whether to take corrective action. Indeed, Maj. Gen. Wendy M. Masiello, the Deputy Assistant Secretary for Contracting, Office of the Assistant Secretary of the Air Force for

Acquisition, personally became involved in reviewing the LAS procurement. In a February 23, 2012 e-mail, Maj. Gen. Masiello forwarded a list of "Observations" to Lt. Gen. Thomas J. Owen, Air Force Materiel Command, Commander, Aeronautical Systems Center, that identified numerous issues regarding the procurement and HBDC's protest. See AR 33-34, 36. Maj. Gen. Masiello included among those "Observations":

- Record and evaluation reliability issues
    - Two Extremely High Risk Flaws
        - Administrative Record (USG's going in court documents)
            - Incomplete & unorganized record
            - Poorly assembled Administrative Record inconsistent with Federal Rules
                >> Amended once to correct and add information
                >> Recently discovered 170+GB of data that hasn't been thoroughly reviewed—includes duplicative and new documents—not submitted in a coherent form
                >> Team destroyed documents per PM's direction; no deliberate legal review in process

        . . . .

        - Technical Evaluation Plus Associated Risk - Disparate Treatment
            - Decision process inconsistent with RFP
                >> Evaluations of SNC appear conclusory - lacking supporting documentation
            - Demo used incorrectly
                >> Documentation doesn't clearly delineate between technical assessment and associated risk (two separate decision processes)
                >> Appears demo performance is used to justify technical capability not to solely assess risk
- Potential personnel issues
    - Un-cooperative Program Manager (PM)
    - PM repeatedly attempted to determine legally relevant documents
        - PM argued with DOJ, AF attorneys, and review team about what documents could and should be provided
    - Issues
        - Contributes to lack of confidence

- PM's story inconsistent
- Limited official role in source selection,
  - Yet popped in periodically providing direction to SST
  [Source Selection Team]

Id. Those observations also were embodied in a PowerPoint presentation entitled "LAS Protest Way Ahead" attached to the e-mail. See AR 33, 658-60.

Lt. Gen. Owen sent an e-mail later that day to Lt. Gen. Janet C. Wolfenbarger, Military Deputy, Office of the Assistant Secretary of the Air Force (Acquisition), and David M. Van Buren, Air Force Service Acquisition Executive. See AR 35-36; see also AR 2282 (identifying Lt. Gen. Wolfenbarger). Lt. Gen. Owen recommended that "we take corrective action based on what we know. . . . After we get approval to take non-specified corrective action, our JA team will advise DoJ of this decision." Id. at 35.

At Lt. Gen. Owen's request, Maj. Gen. Masiello generated bullet points regarding the future of the LAS procurement on February 23, 2012. See id. at 39. The bullet points set forth the recommendation that the Air Force take corrective action due to administrative record deficiencies and evidence of disparate treatment in line with HBDC's bid protest allegations. Id. The bullet points outline three potential courses of action: (1) requesting new proposal submissions and proceeding with a new evaluation; (2) reinstating HBDC's proposal and putting it into competitive range, which may have required a new demonstration; or (3) attempting to clean up and assemble a complete administrative record to challenge HBDC's bid protest. Id. After asking Maj. Gen. Masiello to forward the bullet points to Mr. Van Buren and Lt. Gen. Wolfenbarger, Lt. Gen. Owen stated, "At this time, I do recommend the more comprehensive 'start over' option." Id. Per Lt. Gen. Owen's request, Maj. Gen. Masiello forwarded the bullet points, along with Lt. Gen. Owen's recommendation of the "start over" approach, to Mr. Van Buren and Lt. Gen. Wolfenbarger on February 23, 2012. See id. at 47. Mr. Van Buren forwarded Maj. Gen. Masiello's observations to the Secretary of the Air Force and the Air Force Chief of Staff the next morning. See id. at 51-52. On February 24, 2012, in response to an inquiry from Under Secretary of Defense Erin C. Conaton as to the proposed course of action, Mr. Van Buren stated that the "start over" approach essentially entailed beginning the source selection process anew with a new team and likely a new solicitation. Id. at 55.

On February 28, 2012, defendant filed its Notice of Corrective Action in No. 11-897C. See Compl. at Ex. C. Although defendant did not state a reason as to why the Air Force was taking corrective action, defendant related that the Air Force

intends to take corrective action in this case by: 1) setting aside the award to [SNC]; 2) reinstating [HBDC] to the competitive range under the procurement; 3) accepting new proposals from the parties, based upon the existing solicitation in its original form, or as amended; 4) conducting meaningful discussions with the parties; 5) reevaluating proposals in accordance with the terms of the solicitation; and 6) reserving the right to conduct a whole new competition.

Id. The Air Force notified SNC that it was terminating the award of the contract on March 2, 2012, see id. at Ex. D, and defendant moved to dismiss HBDC's protest on March 5, 2012, see Def.'s Br. filed Aug. 6, 2012, App. at A3-8, which was granted by court order on May 7, 2012, see id. at A14-15. 4/

III. Determination of subsequent course of corrective action

Air Force discussions regarding the course of corrective action continued after the DOJ filed its Notice of Corrective Action in the HBDC bid protest action. A PowerPoint presentation dated March 9, 2012, created by Charles Vanderberg, 5/ chairperson of the Source Selection Evaluation Team (the "SSET"), contemplated four possible actions. AR 333; see also id. at 5015 (identifying Mr. Vanderberg). The first option was to make no changes to the Solicitation, reinstitute the offerors' then-current proposals at the pre-final evaluation phase, update the then-existing evaluations, and request FPRs for final evaluation. Id. The second option also involved no changes to the Solicitation, but involved requesting new proposals from the offerors to be evaluated anew beginning with the initial evaluation stage. Id. The third option called for amending the Solicitation by making minimal changes, requesting new proposals, and updating the existing evaluations. Id. The fourth option was to issue a new Solicitation, request new proposals, and firewall the existing evaluations from the new evaluation team. Id.

---

4/ The obvious question arises why the parties did not avail themselves of Judge George Miller's four-month familiarity with the background facts relating to the Solicitation, HBDC's challenge of the award to SNC, the dyspeptic release of portions of the administrative record, the nature of the corrective action announced in the notice, the completion of the Commander Directed Report of Investigation, and the corrective action adopted. During the scheduling conference, the undersigned offered to transfer the case to Judge George Miller, and the parties declined. See Transcript of Proceedings, Sierra Nevada Corp. v. United States, No. 12-375C, at 4-5 (Fed. Cl. June 14, 2012).

5/ Mr. Vanderberg was the same PM whose conduct was indicted in the February 2011 BBP. He apparently was no longer the chair or a member of the SSET.

Notes of a March 9, 2012 meeting regarding the courses of action presented by Mr. Vanderberg show discussion of how, if at all, a flight demonstration would be included in the way forward. See id. at 694-97. In discussing whether to eliminate the flight demonstration requirement, Shay D. Assad, DoD's Director, Defense Procurement and Acquisition Policy and Strategic Sourcing, 6/ noted that, if the demonstration were eliminated, the offerors must provide demonstrated data to back up their proposal claims. Id. at 697. He acknowledged that the demonstration "had great value for eval[uation]," but noted that it was "probably not worth it" to include it in the requirements. Id. In response to concerns that keeping the demonstration would simply eliminate HBDC from competition again, Mr. Assad stated that, if a new evaluation yielded that result, "so be it," as the process was "about fair, not keep[ing] both [offerors] in it until the end." Id.

A March 12, 2012 e-mail from Mr. Assad to Maj. Gen. Masiello reflected Mr. Assad's recommendation that risk evaluation be streamlined in the amended solicitation by eliminating the flight demonstration requirement. Id. at 763-64. When Maj. Gen. Masiello inquired whether the amended solicitation would still call for use of the demonstration data already gathered, Mr. Assad responded, "I think that it is important that we require the competitors to bring evidence of demonstrated performance to substantiate their proposed performance. Either one would be free to use the results of the previously performed demo to support their claims of proposed performance." Id. at 763. On March 15, 2012, Mr. Assad delivered a draft amendment to Lt. Gen. Owen, Lt. Gen. Wolfenbarger, and Maj. Gen. Masiello that eliminated the flight demonstration requirement. Id. at 883.

On February 27, 2012, one day prior to defendant's filing of its Notice of Corrective Action, Gen. Donald J. Hoffman, Commander, Air Force Materiel Command, initiated a Commander Directed Report of Investigation (the "CDI Report") and ordered Brig. Gen. Dwyer L. Dennis to investigate agency compliance with acquisition policies, practices, and guidance in the LAS procurement. See id. at 5014-5805. Brig. Gen. Dennis issued the CDI Report on April 5, 2012. See id. at 5014.

Preparation of the CDI Report entailed a review of the documentary evidence surrounding the LAS procurement and interviews of sixteen witnesses, ten of whom were sworn. Id. at 5015-16, 5029. At the outset, the CDI Report identified the obstacles facing the acquisition team:

---

6/ Defendant's brief filed September 21, 2012 identifies Mr. Assad's title and role as "responsible for all [DoD] acquisition and procurement policy matters." Def.'s Br. filed Sept. 21, 2012, App. at A236.

The fundamental challenges of this acquisition were: the aggressive schedule; a politically active environment with one offeror principally US ([HBDC]) offering the AT-6 and one led by a US firm ([SNC]) offering the Brazilian Embraer A-29 Super Tucano; and the contract type (FFP IDIQ) and its effect on an offeror's business case – providing an apparent opportunity for increased future returns.

Id. at 5028.  After marshaling all of the evidence, Brig. Gen. Dennis arrived at several conclusions, including finding issues with documentation of the procurement, inconsistencies in evaluation of the offerors' proposals, and bias exhibited in favor of SNC.  Id. at 5036-49.

With respect to documentation of the source selection process, the CDI Report found that "there appeared to be little to no plan for managing the substantial volume of documentation (in excess of 100,000 pages) that was generated during this source selection."  Id. at 5036.  Although adequate documentation to support the selection decision ultimately was found to exist, it "was not readily discoverable in total or readily auditable."  Id.  That there was sufficient documentation to support the decision, however, did not end the inquiry.  Although the CDI Report found "substantial documentation" of the deficiencies of HBDC's proposal, "the record could possibly be viewed as thin or lacking" with regard to SNC, such that "the depth of analysis was not readily apparent[.]" Id. at 5037.  The evaluation of the technical risk of both proposals, the report found, was evidenced by only "a small quantity of analysis and specific documentation[.]" Id.

Evaluation under the primary Measure of Merit (the "MOM") was also problematic, as the MOM provided two separate paths through which a proposal could be found satisfactory:

The LAS Aircraft Technical Requirements Subfactor 1.1 is met when

[Part 1:] The offeror's technical proposal evidences that (1) the aircraft, in the specific configuration proposed meets or exceeds all LAS SRD [System Requirements Document] threshold requirements, and (2) the FOM [Flight Operations Manual] for the aircraft, in the specific configuration proposed, is approved by the manufacturer's appropriate engineering authority and clearly documents that the aircraft proposed meets, or exceeds the LAS SRD requirements.  The proposed aircraft shall require no additional modification, shall be production ready and shall hold a recognized airworthiness authority certification allowing all LAS mission and SRD requirements.

. . . .

OR

[Part 2:] If the offeror's proposed aircraft does not currently meet one or more LAS SRD requirement, or if the manufacturer's appropriate engineering authority has not approved a FOM which clearly documents that all LAS SRD requirements are currently met, or the offeror's proposed aircraft does not currently hold a recognized airworthiness certificate allowing all LAS SRD requirements, the offeror may submit a plan for meeting, or exceeding these requirements. An acceptable plan must, at a minimum: (1) demonstrate a comprehensive, technically sound, realistic and reasonable approach for the aircraft to meet or exceed all LAS SRD requirements in the proposed configuration; (2) ensure achievement of First Article Test (FAT) prior to contract award . . . ; and (3) allow achievement of USAF Airworthiness Military Type Certification (MTC) prior to Functional Configuration Audit (FCA)/Physical Configuration Audit (PCA).

Id. at 5041-42 (citations omitted).

[



] The CDI Report found that because the MOM provided two disparate means by which it could be satisfied, "[i]t immediately [brought] into question the viability of conducting a truly equitable evaluation and, frankly, whether a true competitive environment ever actually existed for either offeror." Id. at 5043.

The CDI Report noted the same problems arising from the aircraft demonstration that Maj. Gen. Masiello had reported. The demonstration had led to an evaluation that was inconsistent with the Solicitation, as it "fostered a natural inclination to look at 'metal vs. paper'[.]" Id. Despite the fact that the demonstration was to be used solely to assess risk and not mission capability, some evaluations referenced the demonstration as a validation for "met" ratings with respect to technical factors. Id.

[

]

The CDI Report revealed evidence of bias in favor of SNC. The report noted that the evaluation documentation contained a number of "met" statements for SNC "supported with minimal written rationale[.]" Id. at 5046. In light of that evidence, "it appear[ed] that only SNC got the benefit of the doubt[.]" Id. Brig. Gen. Dennis suspected that "the physical assurance of compliance as seen at the aircraft demonstration" contributed to that bias. Id. The CDI Report revealed further evidence of bias in favor of SNC in communications between the PCO and SNC. Id. First, the PCO appeared to have attempted to "broker redactions and/or release of SNC information" during the collection of the administrative record for HBDC's protest. Id. Second, SNC had submitted its FPR without having received a response regarding its complaint about an alleged unfair competitive advantage held by HBDC, suggesting that SNC may have been notified that it was the only offeror in the competitive range. Id. at 5046-47. Third, despite an agreed plan to notify the offerors of elimination and FPR requests by mail, the PCO also sent an FPR notification to SNC by e-mail, whereas the PCO sent notice of elimination to HBDC by mail to the wrong address, resulting in a delay that prevented HBDC from timely requesting a debrief. Id. at 5047.

[

Ultimately, the CDI Report found that the problems in the procurement arose due to shortcomings in the evaluation process that were driven in large part by the complexity of the Solicitation:

> Failure in the LAS source selection lies primarily with the execution by the people involved. Even subsequent changes to policy would most likely not have fully mitigated the shortfalls given the poor execution as clearly successful source selections have routinely been conducted and protest sustained under old policy and procedures such as those directed in MP5315.3. The CDI concluded the failure of this source selection resulted from a combination of a lack of experience, incomplete training, questionable competency of some, fractured team relationships, and a general breakdown in effective communication, especially during key phases of the acquisition. As an example of incompetency, the PCO admitted to legal counsel that she was not qualified to write the Competitive Range Determination Document (CRDD), a fundamental PCO task.
>
>     . . . .
>
> I contend that the combination of these requirements to include: USAF purchase, delivery date, MTC, FAT prior to award, applicability of FAT to new or changed production process, MOM "OR" statement, and system demonstration contributed to an underestimated cumulative complexity which thus undermined a true competitive environment and led to a source selection that was extremely difficult to implement.

Id. at 5053-54, 5057.

On April 13, 2012, the results of the CDI were presented by the Air Force Deputy Assistant Secretary for Contracting to the House Armed Services Committee, but the contents of the briefing were not made available to the public. See Compl. ¶ 27.

Discussions regarding the flight demonstration continued after completion of the CDI Report. On April 13, 2012, Maj. Gen. Masiello notified Mr. Assad that the LAS flight demonstration results were not provided to the offerors because they were considered an assessment of risk and therefore competition sensitive. AR 1234. Because that prevented

submission of prior demonstration data by the offerors in response to an amended solicitation, Mr. Assad responded that the Air Force's "tact [sic] needs to change slightly." Id. Mr. Assad suggested "inform[ing] the offerors that the purpose of the demo was to assist in the risk evaluation, but because we . . . do not want to contaminate the present source selection we are not going to use any of the results. We have [streamlined] the risk assessment and we will use traditional methods to evaluate risk evaluation methods." Id. Maj. Gen. Masiello agreed with Mr. Assad's proposed approach, but expressed concerns regarding the ability to substantiate the offerors' claimed capabilities. Id. at 1318. Mr. Assad responded that "[i]t really is no different with regard to the vast majority of source selections in which we do not have a demo[.]" Id. After confirming that the forthcoming amendment required the offerors to document their assumptions, standards, and references, Maj. Gen. Masiello told Mr. Assad that her concerns had been addressed. Id. at 1324, 1328.

The offerors were briefed on the forthcoming amendment to the Solicitation on April 17, 2012. See id. at 1492; see also id. at 1494-1512 (PowerPoint presentation entitled "Amended RFP FA8637-10-R-6000 for Light Aircraft Support"). Thereafter, the Air Force issued Amendment 0008 to the Solicitation and a Memorandum for Offerors on May 4, 2012, in which the Air Force invited SNC and HBDC to submit new proposals. See Compl. ¶ 28, Ex. E; AR 3201-06. The May 4, 2012 Memorandum for Offerors summarized the revisions to the Solicitation effected by Amendment 0008, as follows:

a. Offerors are to propose for the Afghanistan requirement, as established in Section L, Attachment L-5, for 20 aircraft and associated systems, equipment, and services. Firm Fixed Prices (FFPs) are to be proposed in Section J, Attachment 34 and captured in the Evaluation Price calculated in accordance with Section L.

b. The requirement to propose FFPs for potential requirements, if any, beyond the Afghanistan requirement has been changed to require proposal of Not-to-Exceed prices for potential future aircraft and associated GTDs [Ground Training Devices], Mission Planning Stations, and Mission Debrief Systems. Section L, Instructions to Offerors; Section M, Evaluation Factors for Award; and ordering procedures established in the Model Contract have been revised accordingly.

c. Sections L and M have been revised to remove the requirement for and evaluation of a system demonstration.

d.      The Model Contract and Sections L and M have been revised to move the requirement for a First Article Test for the LAS aircraft to post-award. The requirement for a First Article Test for the GTDs has been eliminated.

e.      The contractual requirement for a Small Business Participation Plan has been deleted. Sections L and M and the Model Contract have been revised accordingly. The requirement to submit a Small Business Subcontracting Plan remains and will be considered in the determination of responsibility.

f.      Exhibits A, B, and C have been updated to clarify data delivery requirements. A Contract Data Requirements List has been added to require access to the Data Accession List. Other Section L attachments also have been updated to clarify data requirements.

g.      The Model Contract has been revised to be current with regulation as of this date. FAR, DFARS, and required CENTCOM in-theater clauses have been updated. The ordering period and resulting Contract Line Item Numbers also have been adjusted to reflect an assumed award date of 10 January 2013.

h.      Other changes incorporated in Sections L and M are designed to provide clarity and to streamline proposal preparation and subsequent evaluation.

AR 3201-02. The memorandum also notified the offerors that a new evaluation team, which included no individuals who served on the original SSET, was in place. Id. at 3202.

IV.  Congressional earmarks

Several provisions of the Solicitation called for a non-developmental item and foreclosed funding for development. See Suppl. AR 2049, 2080, 2915. As a consequence, congressional funding directed to HBDC's aircraft spurred SNC to raise concerns about that funding in an October 25, 2011 letter to the PCO that was later forwarded to the new LAS source selection team on April 17, 2012. See AR 2269-70, 2248. SNC repeated its concerns in a letter to Frank Kendall III, Under Secretary of Defense for Acquisition, Technology, & Logistics, dated April 26, 2012. See id. at 2251-53.

HBDC's proposal offers its AT-6B, which it had developed with a major private aeronautics manufacturer, but this is the same platform as the AT-6. From fiscal years 2008-2010, members of the Kansas congressional delegation earmarked funds "to look at light attack technologies on the [HBDC] AT-6[.]" Id. at 2295; see also Pl.'s Br. filed Aug. 31, 2012, at 23-24 (identifying Kansas delegation as source of earmarks). A document prepared by the Air National Guard (the "ANG") shortly before issuance of Amendment 0008 described how those funds were used. See AR 2291, 2295-98. Some of the funds were used by the ANG in an annual Air Force-directed experiment known as the Joint Expeditionary Forces eXperiment, or "JEFX." Id. at 2295. As part of JEFX 2010, HBDC was paid to install in HBDC AT-6 aircraft a mission computer and its associated communications and datalink capabilities previously developed for the AT-10C aircraft. Id. Air Force pilots flew the aircraft and evaluated the installed system. Id. HBDC was also paid for use of the aircraft, deployment of maintenance and turn personnel, and safety pilots who accompanied the Air Force pilots for insurance and liability reasons. Id.

The earmarks also funded subsequent demonstrations in which the AT-6 was involved. Id. at 2296-97. In September and October 2010, the ANG conducted an operational assessment ("OA") of light attack technologies in a variety of scenarios. Id. at 2296. Air Force, ANG, and Air Force Reserve Corps pilots flew HBDC AT-6 aircraft, which were assessed in the capacity of "a generic light-attack platform," in those tests. Id. Following the OA, the ANG used the HBDC AT-6 in a succession of tactics development and weapons tests conducted in October 2010, early winter 2011, fall 2011, and winter 2012. Id. The Air Force Seek Eagle office and the Non-Nuclear Munitions Safety Board evaluated and approved weapons release from the AT-6 in connection with those tests. Id. Prior to the release of the LAS Solicitation in October 2010, the ANG's demonstration data were made available to the LAS acquisition team through the Air Force acquisitions office. Id. Following release of the Solicitation, the ANG was instructed that it could not have any further contact with the LAS acquisition team, and that prohibition also was coordinated with the Air Force acquisitions office. Id.

During October 2010 the Air Force made inquiries of the ANG regarding what, if any, efforts had been undertaken to aid development of the AT-6. Id. at 2297-98. It appears that the ANG did not respond to those inquiries at that time, although answers were provided in the document prepared shortly before issuance of Amendment 0008. Id. The ANG stated that "every effort was made to avoid tasking [HBDC] and subsequently paying for developmental items." Id. at 2297. The earmarked funds were "used to lease the aircraft, pay for fuel, pay for maintenance, pay for installation and integration of GFE [government-funded equipment] technologies for testing, pay deployment/TDY [temporary duty] costs for [HBDC] personnel supporting ANG testing at various locations, etc." Id. The ANG downplayed any role its testing may have played in enhancing the AT-6 for the requirements

of the LAS procurement, stating, "[T]hat data was [sic] to analyze generic GFE for use in a light-attack role, not necessarily AT-6 specific." Id. at 2297-98.

An April 11, 2012 bullet background paper on the ANG's relationship with HBDC summarized the events discussed above in similar fashion, if in less detail:

> The ANG executed a Congressionally directed demonstration of light attack capabilities utilizing a [HBDC] AT-6B. The demonstration and aircraft modification were funded entirely through Congressional adds and [HBDC] funding. While Congressional language directed the use of [HBDC] AT-6 aircraft for this demonstration, the ANG's objective was to develop platform agnostic lessons learned to inform the [Air Force's] long-term light attack requirements development and possible acquisition strategy.
>
>     . . . .
>
> ANG was always keenly aware of [Air Force] and Congressional sensitivities surrounding the LAS/LAAR acquisition and related light attack projects and made every attempt to maintain a platform neutral approach. The use of the AT-6B was Congressionally directed.

Id. at 2231-32.

HBDC referenced the ANG demonstrations in its proposal and responses to ENs. See Pl.'s Br. filed Aug. 31, 2012, at 25-26. HBDC noted the AT-6's integration of systems from the A-10C and stated that evaluations from JEFX 2010 and the 2010 OA [

                                      ] Suppl. AR 22337. 7/ In response to an EN regarding weapons readiness, HBDC pointed to the weapons testing performed in conjunction with the ANG. Noting that [

                 ] HBC stated that the ANG weapons testing was [

                  ] Id. at 60958, 97070. An EN regarding HBDC's May 12, 2011 proposal update stated that HBDC was relying on [

         ] Id. at 61030-32.

---

    7/ References to "Suppl. AR" are to the administrative record filed in No. 11-897C. See supra note 2.

The LAS Program Office responded to SNC's concerns about the funding in an April 30, 2012 memorandum:

> With respect to the allegations of unfair competitive advantage, the Government does not share your view. An offeror is free to include within its proposal information that might be the result of company funded, commercial, US Government or foreign government activity that has occurred or is ongoing.

AR 2249. An earlier draft of the memorandum invited SNC to provide evidence and facts supporting its argument that HBDC had obtained an advantage through government funding, but that language was eliminated from the final version. See id. at 2258-61 (e-mail chain discussing changes to memorandum); 2263 (redlined draft of memorandum).

## PROCEDURAL HISTORY

Following the Air Force's decision to terminate the contract award, amend the Solicitation, and invite both SNC and HBDC to submit new proposals, SNC filed the complaint in this case. See Compl. filed June 12, 2012. SNC's complaint alleges that (1) the Air Force's decision to terminate the LAS contract and solicit new proposals was arbitrary and capricious; (2) Amendment 0008 to the Solicitation was not targeted to the flaws of the procurement; (3) the Air Force demonstrated bias in favor of HBDC by failing to eliminate HBDC from competition due to HBDC's receipt of government funding and inside information. Id. ¶¶ 32-47. HBDC filed a motion to intervene on June 13, 2012, which the court granted as unopposed on June 15, 2012. See Mot. filed June 13, 2012; Order entered June 15, 2012.

On June 14, 2012, the court conducted a telephonic scheduling conference, during which submission of the administrative record was discussed. The court ordered the CDI Report to be made part of the administrative record on the ground that its preparation preceded the draft of Amendment 0008. See Transcript of Proceedings, Sierra Nevada Corp. v. United States, No. 12-375C, at 13 (Fed. Cl. June 14, 2012) ("Tr."). Although counsel for defendant contended that the drafters of Amendment 0008 were not shown the CDI Report, see id. at 13-14, he later notified the court that his understanding was incorrect, see Def.'s Br. filed Sept. 21, 2012, at 10 n.1. During the June 14 scheduling conference, the court further stated that those portions of the administrative record in No. 11-897C that the parties agreed were relevant would be made part of the administrative record in this protest. See Tr. at 22-23. On July 11, 2012, defendant filed the administrative record, including the CDI Report. See Notice of Filing of Administrative Record, filed July 11, 2012. Defendant also filed a designation of potentially relevant documents from the administrative record in No.

11-897C, noting that the parties reserved the right to cite additional documents from that administrative record if necessary. See Def.'s Designation of Documents from the Prior Administrative Record That Are Potentially Relevant to the Instant Case filed July 11, 2012. Intervenor filed its own designation the same day. See Intvr.'s Designation of Potentially Relevant Documents from the Administrative Record in Case No. 11-897C, filed July 11, 2012.

Plaintiff moved to supplement the administrative record on July 30, 2012, to include in the administrative record in this case all documents that were discovered to be missing from the administrative record in No. 11-897C, the 160 gigabytes of records referred to as the "Additional Records" that were generated by the Air Force during the Solicitation, evaluation, and 2011 award that were not used or reviewed by the Air Force in deciding to take corrective action. See Mot. filed July 30, 2012. Briefing on the motion was completed on August 9, 2012, and the court denied the motion on August 14, 2012. See Sierra Nevada Corp. v. United States, No. 12-375C, slip. op. at 14 (Fed. Cl. Aug. 14, 2012). In its unpublished fourteen-page speaking order, the court acknowledged that the record presented to date did not ground the Air Force's decision to take corrective action solely on the lack of a certifiable administrative record; rather, it showed that the Air Force also contemporaneously had recorded serious concerns with the competence and impartiality of the evaluation process. See id. at 11. The Air Force had identified several concerns that undermined the integrity of the procurement. Thus, the Additional Records (plaintiff characterizes the then-unreviewed portions of the administrative record in No. 11-897C and the missing documents as 95% of the record, see Pl.'s Br. filed Sept. 28, 2012, at 5, 21) were not by any means the only rationale given by the Air Force for its decision to take corrective action:

> The court acknowledges plaintiff's concern that the CDI Report concludes that a defensible administrative record could have been assembled and that the 2011 award to plaintiff could have been defended based on the CDI's review of the 100,000+page record, as well as "previously-thought missing data." See Pl.'s July 30 Mot. App. C at 30-31 (CDI Report). While the CDI Report may be germane to the corrective action in the form of Amendment 0008, it is not the calibrator of the reasonableness of the Air Force's decision to take corrective action during the February 2012 time frame to set aside the 2011 award to plaintiff. [The CDI Report's] [f]inding that a full and competent evaluation could have supported an award to plaintiff and that intervenor appeared to be readily disqualified does not address the factual issues before the court—whether, at the time it was made, the Air Force's decision to take corrective action was reasonable and whether the substance of that corrective action was reasonable.

<u>Sierra Nevada</u>, slip op. at 13 (footnote omitted).

The court listed two issues for resolution on cross-motions for summary judgment on the administrative record: "whether the Air Force was justified in taking corrective action and whether the corrective action was reasonable." <u>Id.</u> at 12.

The court scheduled expedited briefing on cross-motions, with plaintiff's motion filed on August 31, 2012. Both defendant and intervenor filed cross-motions and oppositions to plaintiff's motion on September 21, 2012. Briefing was completed on October 5, 2012. Argument was held on October 10, 2012.

## DISCUSSION

I. <u>Jurisdiction and standard of review in bid protest actions</u>

The United States Court of Appeals for the Federal Circuit "has made clear that bid protest jurisdiction arises when an agency decides to take corrective action." <u>Sys. Application & Techs., Inc. v. United States</u>, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (citing <u>Turner Constr. Co. v. United States</u>, 645 F.3d 1377 (Fed. Cir. 2011)). The corrective action challenged is the Air Force's cancellation of the LAS contract award to SNC and resolicitation of proposals pursuant to Amendment 0008. Consequently, this action falls within the Court of Federal Claims' bid protest jurisdiction. 28 U.S.C. § 1491(b)(1) (2006). Plaintiff has standing under the rationale explicated in <u>Systems Application & Technologies</u>, 691 F.3d at 1382-83, and that requirement, too, has been satisfied. This protest also meets the ripeness requirements set forth by the Federal Circuit for challenges to corrective action. <u>See id.</u> at 1383-84.

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870 (codified at 28 U.S.C. § 1491(b)) (the "ADRA"), amended the Tucker Act, 28 U.S.C. § 1491(b)(1), granting the Court of Federal Claims jurisdiction over bid protests. <u>See</u> <u>Res. Conservation Grp., LLC v. United States</u>, 597 F.3d 1238, 1243 (Fed. Cir. 2010); <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001) ("<u>Domenico Garufi</u>"). The ADRA's standard of review for agency procurement decisions adopted the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2006) (the "APA"). <u>See</u> 28 U.S.C. § 1491(b)(4). The court has authority under the APA to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); <u>see also</u> <u>PGBA, LLC v. United States</u>, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004) (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement

decisions); see also Domenico Garufi, 238 F.3d at 1332-33 (making applicable the standards applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and its progeny to bid protests).

Accordingly, as restated by the Federal Circuit, "[a] bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines if, under the arbitrary and capricious standard, the agency acted either (1) without rational basis, or (2) contrary to law. 8/ Id.; see Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004); Domenico Garufi, 238 F.3d at 1333; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996). Second, if the court finds that the agency acted in violation of the APA standard, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." Bannum, 404 F.3d at 1351. In either case the plaintiff bears the "heavy burden" of proving this lack of rational basis or violation of the law by a preponderance of the evidence. Domenico Garufi, 238 F.3d at 1333.

Agency action is arbitrary or capricious when it does not have a rational basis for its decision. A rational basis requires "the contracting agency [to] provide[] a coherent and reasonable explanation of its exercise of discretion." Id. (internal quotation marks omitted). The court's role in a bid protest, including ascertaining the existence of a rational basis, is not to substitute judgment for the agency; indeed, the agency generally is accorded wide discretion in evaluating bids, and the court should not substitute its judgment for that of the agency. Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994); see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (stating that courts should review facts to determine if agency's decision is supported by rational basis).

A contracting officer's discretion in a negotiated procurement is recognized as "'relatively high.'" Burroughs Corp. v. United States, 617 F.2d 590, 597 (Ct. Cl. 1980) (quoted in Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)). Deference to this broad discretion extends to the decision to pursue corrective action during the course of a procurement. See Wildflower Int'l, Ltd. v. United States, No. 11-734C, 2012 WL 2044784, at *22 (Fed. Cl. 2012) (citing cases).

The Court of Federal Claims has more or less settled on a standard for review of challenges to corrective actions. It must be reasonable under the circumstances. See id.

_____

8/ This language encompasses the alternative ground for a bid protest: whether the agency action constituted a clear and prejudicial violation of an applicable procurement regulation. See Domenico Garufi, 238 F.3d at 1332-33.

21

This is consistent with the requirement that a protestor must demonstrate that a procurement decision lacked a reasonable basis. Thus, the task of the court is to determine whether the record supports the Air Force's finding that flaws in the LAS procurement process warranted corrective action and whether the corrective action taken by the Air Force was reasonable under the circumstances.

This court comments on the decisional law relied on by plaintiff because the parties expended considerable effort debating the proper standard of review. Although the decisions in Sheridan Corp. v. United States, 95 Fed. Cl. 141, 151 (2010), and DGS Contract Service, Inc. v. United States, 43 Fed. Cl. 227, 238 (1999), generally recite that the corrective action must be reasonable under the circumstances, Sheridan requires that the "corrective action must be rationally related to the defect to be corrected," Sheridan, 95 Fed. Cl. at 151, and both Sheridan and DGS recite that an agency has "'broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition.'" Id. (quoting DGS, 43 Fed. Cl. at 238). The difficulties for this case can be traced to the Sheridan court's distillation of its holding: "Simply put, the corrective action must target the identified defect," Id. at 153, and the notion drawn from Sheridan and DGS that a valid reason for taking corrective action is to ensure fair and impartial competition.

Sheridan cites as authority for its "targeting" standard MCII Generator & Electric, Inc. v. United States, No. 02-85C, 2002 WL 32126244, at *1 (Fed. Cl. 2002), an unpublished decision that "phrase[s] another way" the standards of three other cited decisions. One discusses error in the context of reciting that a protestor must show that it was prejudiced by any significant error in the procurement process. See ManTech Telecomm. & Info Sys. v. United States, 49 Fed. Cl. 57, 64 (2001). The other two cases cited by MCII are the venerable Domenico Garufi, 238 F.3d at 1332, which enshrines the basic principle that, if the challenge is to the rationale or basis for the decision, contracting officers are allowed to exercise broad discretion in the procurement process and that a coherent and reasonable explanation of the exercise of discretion is required. The third case cited by MCII, Crux Computer Corp. v. United States, 24 Cl. Ct. 223, 226 (1991), heralds back to Supreme Court of the United States case law for the proposition that the agency must show a reasonable basis between the facts of the situation and the decision made.

The butterfly effect of holding that "the corrective action must target the identified defect," Sheridan, 95 Fed. Cl. at 153, should not be exported to a more nuanced case, such as the case at bar. For example, in this case, unlike Sheridan, discussions had taken place and proposal revisions had been submitted, so that resolicitation as opposed to reevaluation would be viewed as reasonable in the circumstances. As another example, Amendment 0008 amended portions of the Solicitation that were not related to the alleged defects,

although the Air Force was attempting by those amendments to avoid evaluation problems of the same nature that might reoccur when the new proposals were evaluated. The reasonable in-the-circumstances test should apply; the targeted-action test would be too restrictive.

Plaintiff also argues that <u>Sheridan</u> and <u>DGS</u> require the contracting officer to make a finding that the proposed corrective action will enhance competition. While that consideration is supposed to be an operating principle guiding the actions of procurement officials, it is not a talisman for assessing whether the corrective action was reasonable in the circumstances. If <u>MCII</u> was a source for that proposition, <u>MCII</u>, 2002 WL 32126244, at *5 (citing <u>T&M Distrib., Inc. v. United States</u>, 185 F.3d 1270, 1283 (Fed. Cir. 1999)), it rests on a miscitation. <u>T&M</u> dealt with a termination for convenience and, on the page cited in <u>MCII</u>, the court in <u>T&M</u> quoted the standard that a termination for convenience in furtherance of statutory requirements for full and open competition will not be held to be an abuse of the contracting officer's discretion. <u>DGS</u> cites a GAO decision, but should not be read to endorse the notion that a specific finding that the corrective action will further competitive goals is required by the agency. <u>DGS</u>, 43 Fed. Cl. at 238.

## II. Standards of review for judgment on the administrative record and for injunctive relief

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1(c). This rule provides a procedure that allows the court to expedite a trial by using a "paper record, allowing fact-finding by the trial court." <u>Bannum</u>, 404 F.3d at 1356. Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. <u>Id.</u> at 1355-56.

Plaintiff seeks a permanent injunction enjoining the Air Force from resoliciting the contract based on new proposals and reversing its contract award. The Federal Circuit has described injunctive relief as "extraordinary relief." <u>FMC Corp. v. United States</u>, 3 F.3d 424, 427 (Fed. Cir. 1993). Adoption of the APA substantive standard of review did not change the court's standard for granting injunctive relief. <u>See</u> <u>PGBA</u>, 389 F.3d at 1225-26 (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief). In order to obtain an injunction, the Federal Circuit requires a protestor to establish that "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." <u>Centech Grp., Inc. v. United States</u>, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Success on the merits previously has been held to be the most important factor for a court to

consider when deciding whether to issue injunctive relief. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007).

## III. Decision to take corrective action

Plaintiff's first challenge is to the Air Force's decision to take corrective action rather than to assemble a complete administrative record and litigate HBDC's bid protest. Plaintiff focuses its argument on the CRD that eliminated HBDC from the procurement, urging that the CRD was untainted by any purported flaws in the procurement process and that corrective action was therefore unnecessary to ensure a fair competition. Pl.'s Br. filed Aug. 31, 2012, at 6-9. Plaintiff further argues that the concerns identified in Maj. Gen. Masiello's February 23, 2012 e-mail did not warrant corrective action. Id. at 9-12. Plaintiff sees no indication in Maj. Gen. Masiello's e-mail that the documents missing from the administrative record would have led to a different CRD. Id. at 10-11. Next, plaintiff dismisses Maj. Gen. Masiello's concerns about the PM's uncooperative nature, again arguing that those concerns did not bear on the reliability of the CRD. Id. at 11. Finally, plaintiff argues that Maj. Gen. Masiello's concerns about evaluation inconsistencies were grounded in misuse of flight demonstration data and that any misuse of that data merely corroborated that SNC's proposal satisfied technical requirements. Id. at 11-12. Plaintiff argues that any such misuse had no bearing on the CRD, which assessed whether HBDC's proposal met technical requirements and presented an acceptable risk level. Id. at 12. Plaintiff cites the CDI Report for support, suggesting that it found that the decision to eliminate HBDC from competitive range was supported adequately. Id. at 12-13.

Defendant and intervenor respond that the decision to take corrective action was proper under the circumstances. They first cite the Government's concern during the HBDC bid protest that it would be unable to assemble a complete administrative record, as evidenced by the difficulties in assembling the record that was filed, the obdurate PM who did not cooperate in assembling the record, the evidence of document destruction without legal oversight, and the discovery of voluminous additional documents after the record was filed. Def.'s Br. filed Sept. 21, 2012, at 11-22; Intvr.'s Br. filed Sept. 21, 2012, at 10-14. Defendant and intervenor argue that assembly of a complete administrative record was a prerequisite to defending against HBDC's bid protest and that the Government's well-founded belief that no record could ever be certified as complete justified corrective action. Def.'s Br. filed Sept. 21, 2012, at 22; Intvr.'s Br. filed Sept. 21, 2012, at 10-11.

Next, defendant and intervenor point to evidence of bias in favor of SNC during the procurement process. As Maj. Gen. Masiello's February 23, 2012 e-mail noted, the evaluations of SNC lacked documentation and appeared conclusory, and flight demonstration data had been misused to evaluate technical capability. Def.'s Br. filed Sept.

21, 2012, at 23; Intvr.'s Br. filed Sept. 21, 2012, at 16. They refer to internal documents indicating that the PCO was continuing discussions with SNC during HBDC's bid protest and efforts by the PM to keep certain information out of the administrative record. Def.'s Br. filed Sept. 21, 2012, at 26. Intervenor argues that the Air Force's "extraordinary decision" to commission the CDI suggests the gravity of the concerns raised by early investigative efforts. Intvr.'s Br. filed Sept. 21, 2012, at 16-17.

The court finds that it was rational and reasonable for the Air Force to take corrective action in response to the HBDC bid protest and that the Air Force documented its rationale for doing so. The record up to the date on which the notice of corrective action was filed 9/ discloses that the documentation on the procurement was in shambles and would require significant effort to assemble. The difficulty of that task would be compounded by an uncooperative PM who was attempting to keep certain materials out of the record and did not trust DOJ counsel. Moreover, the documentary evidence reviewed appeared to show favoritism toward SNC in the form of conclusory evaluations and misused flight demonstration data. The actions of the PCO in continuing discussions with SNC also contributed to the appearance that bias had infected the procurement process. Plaintiff's argument that no evidence suggests that any bias affected the CRD is not persuasive. Plaintiff essentially argues that the Air Force should have come to a different conclusion from the evidence. The court finds that ample evidence was before the Air Force to support its concern that the procurement was likely tainted by bias, and it was certainly reasonable to suspect that such bias affected the CRD. In those circumstances it was rational and reasonable to file a notice of corrective action rather than continue to litigate the HBDC bid protest.

───────────────

9/ The court notes that, with respect to the decision to take corrective action, the only relevant information was that available to the Air Force as of the date the notice of corrective action was filed. In light of that finding, plaintiff cannot elevate the CDI Report to represent the Air Force's ultimate findings, as that document was not available at the time the decision to take corrective action was made. The CDI Report provided fuel for plaintiff to contend that the award to SNC could have been upheld and that HBDC flat-out failed the CRD and for defendant and HBDC to contend that the CDI Report pointed to manifold failures in the entire process from the drafting of the Solicitation through the evaluation. The court finds that the CDI Report does not supplant or undermine the reasons given by the Air Force for the decision to take corrective action.

As is discussed below, however, the CDI Report is relevant to the reasonableness or rationality of the corrective action taken by the Air Force.

IV. <u>Form of corrective action taken</u>

Plaintiff mounts three challenges to the form the Air Force's corrective action took. First, plaintiff argues that there was no rational basis for cancellation of the contract award to SNC. Pl.'s Br. filed Aug. 31, 2012, at 17-20. Second, plaintiff argues that there was no rational basis for eliminating the flight demonstration requirement. <u>Id.</u> at 20-23. Finally, plaintiff argues that HBDC should not have been reinstated to competitive range because reinstatement was contrary to the Solicitation's prohibition on the use of government funds for development and because HBDC obtained an unfair competitive advantage as a result of government funding. <u>Id.</u> at 23-30. The court examines each argument in turn.

1. <u>Cancellation of the contract award</u>

Relying primarily on <u>Sheridan Corp.</u>, 95 Fed. Cl. 141, plaintiff argues that there was no rational basis for the Air Force to cancel the contract award to SNC. Pl.'s Br. filed Aug. 31, 2012, at 17-18. The procurement problems in <u>Sheridan</u> to be addressed by corrective action related to evaluation of the proposals. <u>Id.</u> (quoting <u>Sheridan</u>, 95 Fed. Cl. at 153). The court held that resolicitation was not targeted to the errors in evaluation and therefore was not rational. <u>Id.</u> (quoting <u>Sheridan</u>, 95 Fed. Cl. at 153). Plaintiff argues that the decision to cancel the contract award and resolicit proposals is similarly flawed. If the flaw to be addressed was the unreliability or incompleteness of the administrative record, plaintiff argues, cancellation and resolicitation were not targeted to correct that flaw. <u>Id.</u> at 18. Plaintiff cites the CDI Report's finding that, given enough time and proficiency, the Air Force could have assembled a complete administrative record. <u>Id.</u> at 19. Furthermore, if the problem was that data from the flight demonstration could be used improperly, cancellation and resolicitation were not targeted to correct that flaw. <u>Id.</u> at 20. In that scenario, as in <u>Sheridan</u>, plaintiff maintains that the targeted solution is reevaluation, not cancellation and resolicitation. <u>Id.</u> at 18.

Defendant responds that the decision to cancel and resolicit was justified. Defendant again notes that, in light of the obstacles facing the Air Force in assembling an administrative record, the Air Force rationally concluded at the time DOJ filed the notice of corrective action on behalf of the Air Force that it could never certify that the administrative record was complete. Def.'s Br. filed Sept. 21, 2012, at 33. Defendant further notes that while the CDI Report may have concluded that it was possible to assemble a complete administrative record, that document was not available to the Air Force at the time it decided to cancel the contract award and resolicit proposals. <u>Id.</u> Defendant urges that the decision in favor of cancellation and resolicitation was driven not only by the incompleteness of the administrative record, but also by evidence of errors in the evaluation process, including disparate treatment and personnel problems. <u>Id.</u> at 36. The Air Force concluded from the

evidence available that "this was a fundamentally flawed procurement" and that cancellation was rational in light of that determination. Id. at 36-37. Defendant distinguishes Sheridan, noting that the award decision in Sheridan was based solely on initial proposals without any discussions with offerors, whereas the procurement at issue here involved extensive discussions with the offerors. Id. at 37-38. Moreover, both of the proposals in this case, unlike those in Sheridan, were flawed. Id. at 38. [

] Intervenor's arguments largely track defendant's. See Intvr.'s Br. filed Sept. 21, 2012, at 21-23.

As an initial matter, defendant is correct that the CDI Report was not available at the time the Air Force decided to take corrective action. The record discloses that the decision to cancel the award was made by February 24, 2012, but the CDI Report was not completed until April 5, 2012. Accordingly, the CDI Report did not have had any bearing on the Air Force's decision to cancel the award, and the court does not consider it with regard to this aspect of the case. See supra note 9.

Stripping away any CDI Report opinion that the Air Force could have assembled a complete administrative record, plaintiff is left arguing for the most part that cancellation was not a rational response to the Air Force's conclusion that it could not have assembled a complete administrative record. As defendant and intervenor point out, however, the record shows that the decision to cancel the contract award and resolicit proposals also was driven by the discovery of irregularities in the procurement process. Lt. Gen. Masiello's initial February 23, 2012 e-mail and subsequent correspondence establish that the Air Force was concerned about the evidence of bias demonstrated both in documentation and personnel. Furthermore, the difficulties in assembling an administrative record were due to actions of its personnel whose conduct raised red flags about the existence of bias in the procurement. The more salient question, therefore, is whether cancellation of the contract award was a rational response to the evidence of bias uncovered in the Air Force's initial investigative efforts. Although this court rejects Sheridan's restrictive targeting standard in favor of reasonableness in the circumstances, Sheridan is apposite.

Sheridan involved the award of a contract based solely on initial proposals, without any subsequent discussions with the offerors. 95 Fed. Cl. at 145-47. However, the evaluation team had established a competitive range that excluded all offerors but the awardee. Id. at 146. The Sheridan court actually identified a violation of an applicable procurement regulation whereby the agency had erred in creating a competitive range because no discussions with offerors had taken place. See 95 Fed. Cl. at 152 (discussing 48 C.F.R. (FAR) § 15.306(c)(1) (2012)). In response to a bid protest from a non-awardee offeror lodged with the GAO, the agency canceled the contract, expanded the competitive

range to include three offerors, and solicited revised proposals based on the same requirements contained in the original solicitation. Id. at 147. Noting that the only errors in the procurement pertained to evaluation of the offerors' proposals ("the actual proposals received by the agency had no flaws," id. at 153), the court held that the corrective action was not "rational" (defined as targeted to the identified defect). Id. The court ruled that where the problem to be addressed by corrective action is a flawed evaluation process, reevaluation may be warranted, but resolicitation was not. Id. at 154.

The record to date at the time the Air Force decided to cancel the contract award to SNC suggested bias toward SNC by the SSET, the PM, and the PCO. As observed by Lt. Gen. Masiello, that bias manifested in the documentation used to support the procurement decision. It thus appears that the deficiencies in the LAS procurement, as understood by the Air Force at the time it decided to cancel the contract award, pertained to the evaluation of the offerors' proposals. Consequently, it would seem that Sheridan is persuasive authority that cancellation and resolicitation were not rationally related to addressing the problems uncovered by the Air Force and that reevaluation of the proposals as they were then postured would have been appropriate. As defendant notes, however, this case differs from Sheridan in one crucial respect. While the award in Sheridan was made on the basis of evaluation of initial proposals only, the award in this case was made after extensive post-proposal discussions between the Air Force and the offerors. Given that the Air Force's initial investigation had uncovered evidence of bias in favor of SNC, it was reasonable at the time for the Air Force to consider that such bias likely affected not only the evaluation of the offerors' proposals, but also the post-proposal discussions and the offerors' responses thereto. If the Air Force reasonably considered that the entire process was tainted by bias, corrective action to amend the solicitation and to request new proposals was a reasonable solution in the circumstances. Thus, the Air Force's decision to cancel the contract award to SNC and resolicit proposals was reasonable and rational and should stand.

One aspect of plaintiff's challenge to the form of the corrective action was resolved during argument. The Notice of Corrective Action filed in the HBDC protest before Judge George Miller related that the Air Force was reinstating HBDC to the competitive range. See Compl. at Ex. C. The Air Force had no reasonable basis for bypassing a CRD, if called for, should discussions occur on the evaluation of proposals under the amended solicitation. During argument the court was assured that the effect of the corrective action was to qualify HBDC to submit a new proposal, not to find that HBDC's proposal qualified to put it in the competitive range. The court was advised that no CRD had taken place, and, if a CRD is required, it will proceed de novo with no offeror deemed to be in the competitive range.

## 2. Elimination of the flight demonstration requirement

Plaintiff argues that Amendment 0008's elimination of the flight demonstration requirement also was not rationally related to the flaws uncovered by the Air Force. 10/ Plaintiff characterizes the concerns about the flight demonstration as grounded in misuse of data associated with the demonstration, not the use of the flight demonstration itself as an evaluative tool. Pl.'s Br. filed Aug. 31, 2012, at 20-21. According to plaintiff, post-termination discussions regarding the flight demonstration centered on whether to retain the demonstration in the amended solicitation, but not on why elimination was found to be appropriate. Id. at 21-22. Concerns were expressed by Air Force personnel that resolicitation might lead to charges of "leveling," as resolicitation would permit HBDC more time to improve its aircraft. Id. at 21. Plaintiff cites to the notes of the March 9, 2012 meeting in which one attendee expressed concern that, if a flight demonstration were included in the amended solicitation, HBDC again would be put out of the competitive range. Id. at 22-23. Plaintiff argues that the flight demonstration was eliminated solely for the purpose of ensuring HBDC's inclusion and that this action therefore lacked a rational basis. Id.

Defendant responds that the flight demonstration was eliminated because it confused the evaluators and caused them to use it in a manner inconsistent with the Solicitation. Def.'s Br. filed Sept. 21, 2012, at 39. Defendant points to the CDI Report, which found that the evaluators used the demonstration to evaluate technical capability instead of risk, which ran counter to its stated purpose in the Solicitation. Id. Due to the "natural inclination to look at 'metal vs. paper[,]'" the Air Force reasonably could contend that the flight demonstration's inclusion caused confusion among the evaluators with regard to how to use it. Id. (quoting AR 5043). Defendant relies on the statement of Mr. Assad, DoD's Director, Defense Procurement and Acquisition Policy and Strategic Sourcing, that eliminating the flight demonstration would be "no different with regard to the vast majority of source selections in which we do not have a demo[.]" Id. at 39-40; AR 1318. Defendant touts this statement for the proposition that flight demonstrations are not necessary in non-developmental procurements. Def.'s Br. filed Sept. 21, 2012, at 40.

---

10/ The complaint also took issue with Amendment 0008's elimination of the FAT requirement prior to contract award. See Compl. ¶ 31. As intervenor points out, plaintiff did not advance that argument in its motion for judgment on the administrative record. See Intvr.'s Br. filed Sept. 21, 2012, at 20 n.13. Plaintiff neither addresses intervenor's point nor puts forth any argument regarding FAT in its reply brief, see Pl.'s Br. filed Sept. 28, 2012, and the court accordingly finds that plaintiff has waived any objection to the amended solicitation on this issue.

Defendant also faults plaintiff for misrepresenting the record with respect to concerns about "leveling," noting that such concerns were brought to the attention of senior leadership, who nonetheless elected to move forward with the resolicitation. Id. at 41 (citing AR 80). With respect to notes of the March 9, 2012 meeting, defendant highlights Mr. Assad's opinion that, while the demonstration had "great value" for evaluation, it was "probably not worth it." Id. at 42; AR 697. Defendant suggests that Mr. Assad held that opinion because of the confusion that the demonstration had caused for the evaluators. Def.'s Br. filed Sept. 21, 2012, at 42.

Again, intervenor's arguments complement defendant's. See Intvr.'s Br. filed Sept. 21, 2012, at 23-26. Intervenor argues that the internal Air Force discussions cited by defendant show that the Air Force engaged in considered, rational decisionmaking in deciding to eliminate the flight demonstration requirement. Id. at 24. Intervenor further argues that plaintiff illogically suggests that the flight demonstration requirement was eliminated to ensure HBDC's inclusion in the competition, because the demonstration took place in January 2011 and HBDC was not excluded until October 2011. Id. at 26. Thus, intervenor argues, the flight demonstration was not responsible for HBDC's exclusion, and elimination of the requirement therefore would have no effect on the competitiveness of HBDC's proposal. Id.

At the time the Air Force issued Amendment 0008, which eliminated the flight demonstration requirement in the Solicitation, it had the benefit of the CDI Report's thorough investigation into the procurement. The report noted that the flight demonstration was misused to assess technical capability rather than solely risk, attributing that in part to "a natural inclination to look at 'metal vs. paper'[.]" AR 5043. Notably, the CDI Report did not find that the flight demonstration would lead to such misuse. As the CDI Report concluded, the primary flaw in the procurement was in the execution. See id. at 5053-54. Thus, it appears that evaluation of the flight demonstration, not the flight demonstration itself, was the primary cause of the misuse of demonstration data to assess technical merit in contrast to performance risk. In that event, reevaluation under proper instruction, not elimination of the requirement altogether, would seem to be the rational response.

The Air Force's discussions regarding the flight demonstration further support that notion. Mr. Assad acknowledged that the flight demonstration had "great value" for evaluation, see id. at 697, and continued to hold the view that the demonstration data should be evaluated as part of new proposals until it became clear that the offerors were not in possession of that data. See id. at 763-64, 1328-29. Maj. Gen. Masiello continued to press her misgivings about relying on Flight Operations Manuals ("FOMs") over actual demonstrations and about hamstringing the evaluation team's assessment of the "reality of what the contractors propose and assert are in fact capabilities or intended capabilities." Id.

at 1318. The Air Force may be convinced that it can assess risk without a flight demonstration and rely on the offerors' FOMs, but the fact remains that a flight demonstration was included in the Solicitation and was acknowledged to be a useful evaluative tool.

Ultimately, the court resolves the issue based on the Air Force's resolution of Mr. Assad's and Maj. Gen. Masiello's concerns that is reflected in the e-mail chains on the subject over April 12-14, 2012. See id. at 1318-19, 1324-27, 1328-30. Once it became clear to Mr. Assad that the offerors did not possess their flight demonstration data and therefore could not submit the data as part of new proposals, he suggested that the Air Force could obtain risk assessment information through "traditional methods." See id. at 1318. Maj. Gen. Masiello initially expressed concerns that such a change might result in too much reliance on FOMs, see id., but her concerns were assuaged by the changes in section L "'requiring the offerors to document their assumptions, standards, and references [to support the offerors' technical approaches] that should help distinguish 'real' from 'promised' technical capability.'" Id. at 1324. Maj. Gen. Masiello learned of those changes through an e-mail from Col. James G. Fulton, ASC/WKP, which also contained the following view:

> We recognized going into this that we didn't have the latitude to re-write the SRDs as if starting over. We focused only on those things where the degree of ambiguity in the spec might make it possible for an offeror to take exception with how we conduct our evaluation based on interpretation of what was written. Those interpretations will likely be different between offerors, not just between an offeror and the government. Should a situation like this arise, we will simply handle it through the EN process.

Id.

The Air Force took a conservative approach to drafting the amended solicitation in order to prescind different interpretations of requirements by the offerors that could lead to more problems. The Air Force has considerable discretion in addressing the performance capabilities of LAS aircraft that may be viewed as SNC's production model versus HBDC's prototype. See id. at 1318 (Apr. 14, 2012 e-mail from Maj. Gen. Masiello contrasting "capabilities" and "intended capabilities"). The court finds that the Air Force's removal of the flight demonstration requirement from the risk assessment evaluation was reasonable in the circumstances.

3. <u>Reinstatement of HBDC to competitive range</u>

Plaintiff points to the earmarks designating funding for HBDC's aircraft and HBDC's subsequent work with the ANG as evidence that the Government funded development of HBDC's aircraft. Pl.'s Br. filed Aug. 31, 2012, at 23-26. According to plaintiff, HBDC's use of that funding violated Section L 1.1, 6.3, and Attachment 20 of the Solicitation. <u>Id.</u> at 25. Section L 1.1 stated that the Government was seeking "a nondevelopmental item (NDI) aircraft" and that "development funds are not available" for the procurement. Suppl. AR 2049. Section L 6.3, which provided information to assist the offerors in the preparation of their price proposals, stated, "The Government will not fund any development associated with the offerors' proposed solution. All such costs are the sole responsibility of the offeror." Suppl. AR 2080. Attachment 20 to Section L, bearing the heading "Overall assumptions for puposes [sic] of developing an evaluated price[,]" contained the same language as Section L 6.3. <u>11</u>/ Suppl. AR 2915. The amendment retained Section L 1.1, but deleted the language in Attachment 20 regarding government funding. Pl.'s Br. filed Aug. 31, 2012, at 25.

Plaintiff insists that the decision to restore HBDC to competitive range is not rational because it is contrary to the language of the Solicitation and the law. Plaintiff argues that HBDC used government funding to develop its aircraft during the procurement process and that the use of those funds violated terms of the Solicitation disallowing use of government funding after award or provision of government funding for development, as well as violated federal regulations. <u>Id.</u> at 23. Plaintiff asks for a ruling that HBDC should have been disqualified from the original competition. <u>Id.</u>

Plaintiff argues that the evidence regarding earmarks and HBDC's participation in JEFX and subsequent ANG testing shows that HBDC received government funding to

---

<u>11</u>/ To the extent that defendant and intervenor might have argued that plaintiff is taking to task the terms of the amended solicitation within the contemplation of <u>Blue & Gold Fleet</u>, 492 F.3d at 1313 (holding that terms of solicitation must be challenged before closing date for proposal submission), defendant itself states that plaintiff pressed the issue of deleted language before the Air Force in an April 24, 2012 e-mail. <u>See</u> Def.'s Br. filed Sept. 21, 2012, at 48, App. at A311. Not only did plaintiff query the Air Force as to the significance of deleting the language from Attachments 20 and 22 to Section L, but plaintiff on two occasions submitted written objections to the Air Force concerning HBDC's use of government funds in fielding its LAS platform, <u>see</u> AR 2269-70, 2251-53, and the only response to date from the Air Force advised that SNC's concerns were unfounded, <u>see id.</u> at 2249.

develop its aircraft, in contravention of Section L.  Id. at 25.  Plaintiff cites HBDC's reliance on the ANG and OAs in both HBDC's proposal and its responses to ENs to support the argument that HBDC relied on government funding to develop its LAS aircraft.  Id. at 26.  Because, plaintiff argues, the Solicitation required that the aircraft not be developed with government funds, HBDC's proposal violated the Solicitation's requirements.  Id. at 26-27.  HBDC therefore should have been disqualified from the original competition.  Id.

Plaintiff also argues that the earmarked funds for HBDC constituted direct financial support in violation of the Federal Acquisition Regulations and that HBDC had an "unequal access to information" organizational conflict of interest ("OCI") as a result of its participation in JEFX and other ANG programs.  Id. at 27-29.  Proper application of FAR § 9.504(e) requires that HBDC be disqualified due to that OCI.  Id. at 29.

Defendant disagrees with plaintiff's characterization of the use of the earmarked funds.  Citing the April 11, 2012 bullet background paper and the ANG's assessment of HBDC's involvement in JEFX and OAs, defendant asserts that the funding was not used for development of HBDC's aircraft, Def.'s Br. filed Sept. 21, 2012, at 45-47, but for platform-neutral testing of light-attack technologies and weapons systems.  Id.  Defendant faults plaintiff for misinterpreting the Solicitation's language regarding government funding, urging that the language explained the obvious to offerors—that the Air Force would not provide development funds in connection with acquiring non-developmental aircraft and that offerors therefore should take that fact into account when providing pricing information.  Id. at 48.  According to defendant, nothing in the language suggests that the receipt of government funds is grounds for disqualification.  Id.  Moreover, as the earmarked funds were used for platform-neutral tests and not development, HBDC did not run afoul of any prohibition on the use of governmental funds for development.  Id. at 49.

With respect to the deleted language from Attachment 20 to Section L, defendant states that the Air Force informed SNC that the change had been made and that the language was removed as unnecessary.  Id. at 48-49, App. at A311. 12/

Defendant dismisses plaintiff's OCI claim as "clearly meritless."  Id. at 52.  Defendant argues that "hard facts" must support an OCI and that plaintiff has cited its own inferences with respect to HBDC's involvement with the ANG.  Id. at 52-53 (quoting Turner, 645 F.3d at 1387).  The ANG did not conduct any tests associated with LAS, so it was impossible for HBDC to obtain any inside information about the LAS procurement

---

12/ The accretion of the administrative record with documents on implementation of the corrective action appears not to include this document.

through the ANG. Id. at 53. Furthermore, plaintiff's claim that HBDC was able to use the JEFX and other ANG programs to develop its aircraft is belied by the ANG's memo stating that the ANG attempted to ensure that HBDC was not paid for developmental tasks. Id. at 54. Defendant curiously argues that plaintiff could not have been prejudiced by any purported OCI on the part of HBDC because HBDC ultimately was eliminated from competition. Id. at 54-55. (This last point appears to ignore the corrective action.)

Intervenor's arguments adopt defendant's, see Intvr.'s Br. filed Sept. 21, 2012, at 26-39, but also provide some additional detail with respect to the government-funding language in Section L of the Solicitation. Although plaintiff raises concerns about the deletion of the funding language in Attachment 20 to Section L, the language at issue appeared in both Attachment 20 and Attachment 22 to Section L and was removed pursuant to Amendment 0008. Id. at 27-28. Attachment 20 was a template evaluation price workbook, to be completed by the offerors with pricing and schedule information; Attachment 22 was a sample evaluation price workbook, which the Air Force completed with example pricing and schedule information. Id. at 27. Intervenor, as defendant, argues that the language in Attachments 20 and 22 to Section L was cumulative of the funding language contained in Section L 1.1, and therefore was deleted as unnecessary. Id. at 28-29.

Much ink has been spilled regarding, and a key focus of oral argument was, the deletion of the funding language as "unnecessary" from Attachments 20 and 22 to Section L. However, the same language, which appeared in Section L 6.3 of the original Solicitation, remains in place in the amended solicitation. See AR 3190 ("The Government will not fund any development associated with the offerors' proposed solution. All such costs are the sole responsibility of the offeror."). Thus, although the language was removed from Attachments 20 and 22 to Section L, it remains in the body of the amended solicitation. This would lend credence to the arguments of defendant and intervenor that the language in the attachments was unnecessary. Moreover, defense counsel treated the language as "mere surplusage" and represented that the proposals would be evaluated in accordance with the intent of the Solicitation to buy a nondevelopmental item without furnishing government funds for development during contract performance. See Transcript of Proceedings, Sierra Nevada Corp. v. United States, No. 12-375C, at 111 (Fed. Cl. Oct. 10, 2012) ("Tr. II").

The fact is that plaintiff's concern that Amendment 0008 stripped away any requirement dictated by the language is not moot. The semantic differences are significant: The offeror is advised that, in pricing its proposed solution, the offeror must account for federal funding associated with its development (Section L 6.3). That statement bears a different intendment than the Solicitation's broad, redundant statement that, in acquiring NDI aircraft, government funding would not be available in connection with developing the NDI aircraft during the performance of the contract once awarded (Section L 1.1).

With respect to plaintiff's charge of an OCI, the court finds that the record evidence does not support a finding that an OCI existed on HBDC's part. "[A]n OCI must be based on 'hard facts; a mere inference or suspicion of an actual or apparent conflict is not enough.'" <u>Turner</u>, 645 F.3d at 1387 (quoting <u>PAI Corp. v. United States</u>, 614 F.3d 1347, 1352 (Fed. Cir. 2010)). The record shows that HBDC participated, at congressional direction, in JEFX and ANG testing and that, while HBDC's demonstration data were made available to the LAS team prior to the issuance of the Solicitation, the ANG discontinued information sharing after the Solicitation was issued. <u>See</u> AR 2295-98 (undated memo from the ANG to the Air Force). <u>13/</u> No hard facts in the administrative record show any funneling of information from the LAS team to HBDC that would give rise to an OCI.

The thrust of plaintiff's argument is that the decision to reinstate HBDC to the competition was not rational because HBDC should have been disqualified in the first place due to its receipt of government funding that purportedly was used for development prior to award. Although the Air Force eventually sent plaintiff a summary dismissal of SNC's concerns regarding HBDC's funding, <u>see id.</u> at 2249, a prior draft of that memorandum included in the administrative record had asked plaintiff to provide evidence, <u>see id.</u> at 2258-61, 2263. The issues surrounding HBDC's funding any development of its AT-6B during the pre-proposal period have not been subjected to the review that would be expected of circumstances bearing on compliance with material terms of a solicitation. <u>See</u> <u>E.W. Bliss Co. v. United States</u>, 77 F.3d 445, 448 (Fed. Cir. 1996) ("In negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." (citation and quotation marks omitted)). The court expresses no opinion as to the proper meaning of the funding language in Section

---

13/ The court takes the ANG memo at face value, and the Air Force's adoption of its recitations, but notes that the ANG strived to distance itself from the 2008-2010 congressional earmarks that were utilized in 2010 to fund JEFX 2010 (the Joint Expeditionary Forces eXperiment). Subsequent to JEFX 2010, an ANG OA was held in September/October 2010 and then there were "various weapons trials from October 2010, early winter 2011 and then fall 2011 and winter 2012." AR 2296. By the set asides from FY 2008-10, Congress directed the ANG to "look at light attack technology on the Hawker-Beechcraft AT-6." <u>Id.</u> at 2295. The ANG memo emphasizes that the hardware that HBDC installed was not developmental; that the funding was used "to generate sorties, not develop the aircraft;" and that "[a]ll ANG efforts were defined and started well prior to the distribution of the LAS RFP and the initiation of LAS source-selection." <u>Id.</u> at 2295-96. The ANG memo puts the value of the three congressional earmarks at approximately $15 million over three fiscal years. <u>Id.</u> at 2297.

L 6.3, i.e., whether it requires HBDC's pricing proposal to account for all government funding used to advance its AT-6B in meeting the Solicitation's requirements, but expects that the Air Force's evaluators will interpret that language, evaluate the offerors' proposals accordingly, and record their conclusions.

Finally, with respect to the decision to reinstate HBDC to the competitive range, during argument defense counsel, with the Air Force's concurrence, represented that the Air Force's corrective action does not have the effect of advancing HBDC beyond any required CRD under the amended solicitation. See Tr. II at 137-39. Should the Air Force determine that it is proper to conduct a CRD pursuant to the amended solicitation, both offerors will proceed on an equal footing.

## V. Injunctive relief

Plaintiff seeks injunctive relief in the form of (1) a declaration that the Air Force's corrective action decision was arbitrary and capricious; (2) an order setting aside the Air Force's corrective action; and (3) a permanent injunction enjoining the Air Force from implementing its corrective action of cancellation and resolicitation. See Pl.'s Br. filed Aug. 31, 2012, at 37. When considering a request for permanent injunctive relief, a court must consider four factors. While success on the merits is the most important factor, "[n]o one factor, taken individually, is necessarily dispositive." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). Besides (1) success on the merits, injunctive relief requires a plaintiff to demonstrate that (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest. PGBA, 389 F.3d at 1228-29 (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).

Plaintiff has not demonstrated success on the merits. 14/ The court has found the Air Force's decision to take corrective action by canceling the award to SNC, reinstating HBDC to the competition, amending the Solicitation, and resoliciting proposals was reasonable under the circumstances, given the deficiencies in the LAS procurement process that were uncovered.

Plaintiff, however, has shown irreparable harm. "An action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits,' leaving a bid protestor irreparably harmed." Bannum, 60 Fed. Cl. at 730 (quoting Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983), aff'd, 757 F.2d 247 (Fed. Cir. 1985)). Cancellation of the award cost plaintiff its anticipated profits, but plaintiff did not merit award based on such a flawed evaluation. Furthermore, any financial harm to plaintiff is displaced by the hardship that an injunction would impose on the Air Force which is "approaching the halfway point," according to defense counsel, in meeting a January 2013 award date. Tr. II at 115. Finally, the court must consider whether an injunction would be in the public interest. The Air Force made a rational decision to take corrective action and reasonably implemented it by issuing Amendment 0008 and calling for new proposals.

---

14/ Plaintiff argues that a party that has established success on the merits is entitled to a presumption of irreparable harm, citing Systems Application & Technologies, Inc. v. United States, 100 Fed. Cl. 687, 721 (2011), aff'd on other grounds, 691 F.3d 1374 (Fed. Cir. 2012). See Pl.'s Br. filed Aug. 31, 2012, at 37. Systems Application found its support for that proposition in Reebok International Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994). Reebok, however, involved patent infringement, not a bid protest or corrective action, and stated the proposition in the following terms: "A strong showing of likelihood of success on the merits *coupled with continuing infringement* raises a presumption of irreparable harm to the patentee." 32 F.3d at 1556 (emphasis added). It therefore appears that the existence of any presumption of irreparable harm established by demonstrating success on the merits depends upon the cause of action alleged. In the case of a continuing patent infringement, it is reasonable to presume irreparable harm based upon a showing of success on the merits for the reason that "because the very nature of a patent provides the right to exclude, infringement of a valid patent inherently causes irreparable harm in the absence of [certain exceptions]." Pfizer, Inc. v. Teva Pharm., USA, Inc., 429 F.3d 1364, 1381 (Fed. Cir. 2005). Such a presumption may not be appropriate in the context of a bid protest challenging agency corrective action.

## VI. Declaratory relief

Although plaintiff has not established its entitlement to injunctive relief, it has demonstrated that limited declaratory relief should be granted. The court is authorized to award declaratory relief if the court considers it proper. 28 U.S.C. § 1491(b)(2). There is a dearth of authority with respect to the showing required for declaratory relief, but it appears to be less stringent than that required for injunctive relief. See Ulstein Mar., Ltd. v. United States, 833 F.2d 1052, 1055 (1st Cir. 1987) ("Injunctions and declaratory judgments are different remedies. An injunction is a coercive order by a court directing a party to do or refrain from doing something, and applies to future actions. A declaratory judgment states the existing legal rights in a controversy, but does not, in itself, coerce any party or enjoin any future action. Courts have on occasion refused to grant declaratory relief in cases where the effect would be identical to a legally impermissible injunction. But a declaratory judgment is a milder remedy which is frequently available in situations where an injunction is unavailable or inappropriate." (citations omitted)).

Plaintiff has established its entitlement to limited declaratory relief with respect to the Air Force's duty to evaluate the offerors' new proposals against the language regarding government funding for development contained in the amended solicitation's provisions on pricing. Such an evaluation is necessary to determine the acceptability of the offerors' proposals, see E.W. Bliss, 77 F.3d at 448, and the record indicates that the Air Force has not conducted any such evaluation. Moreover, declaratory relief is not inconsistent with the denial of injunctive relief because it will not delay the ongoing procurement process and will assure that the Air Force gives its reasons for applying a provision that has been a matter of dispute between the parties. Accordingly, plaintiff is entitled to a declaration that the source selection decision must take into account the government funding and development language contained in Section L 6.3 of the amended solicitation.

## CONCLUSION

It is the province of the Air Force in the first instance to apply Section L 6.3. Plaintiff's motion for judgment on the administrative record is granted only insofar as the amended solicitation, by its terms, necessitates an explanation of how the offerors' proposals were evaluated against Section L 6.3 of the amended solicitation. Plaintiff's motion is otherwise denied. Defendant and defendant-intervenor's motions for judgment on the administrative record are granted, except to the limited extent indicated. Accordingly, based on the foregoing,

1.  The Clerk of the Court shall enter judgment (1) for plaintiff as to a declaration of the Air Force's duty to apply Section L 6.3 of the amended solicitation and (2) for defendant and defendant-intervenor on plaintiff's request for permanent injunctive relief.

2.  By October 30, 2012, the parties shall identify by brackets any material subject to redaction before this opinion issues for publication.

**IT IS SO ORDERED**.

No costs.

/s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge